JE YON JUNG (SBN #329774)
**MAY JUNG, LLP**
333 City Blvd. West
Suite 327
Orange, CA 9286
(818) 869-6476
jeyon@mayjung.com

OLU K. ORANGE (SBN #213653)
**ORANGE LAW OFFICES, P.C.**
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
(213) 736-9900
Email: oluorange@att.net

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARRY GLENN WILLIAMS and DAMIEN DERON WILLIAMS,<br><br>          Plaintiffs,<br>vs.<br><br>COUNTY OF LOS ANGELES; CITY OF LOS ANGELES; CARMEN TRUTANICH; JAMES JACOBS; ESTATE OF MICHAEL MEJIA; JOE HOLMES; JIM BELL, and DOEs 1 through 10, inclusive,<br><br>          Defendants. | **COMPLAINT FOR DAMAGES**<br><br>**1. 42 U.S.C. § 1983-DUE PROCESS**<br>**2. 42 U.S.C. § 1983-CONSPIRACY**<br>**3. 42 U.S.C. § 1983-FAMILIAL INTERFERENCE**<br>**4. 42 U.S.C. § 1983-*MONELL* COUNTY**<br>**5. 42 U.S.C. § 1983-*MONELL* CITY**<br>**6. VICARIOUS LIABILITY**<br>**7. CAL. CODE § 52.1 BANE ACT**<br>**8. NEGLIGENCE**<br>**9. MANDATORY DUTIES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Barry Glenn Williams and Damien Deron Williams, by and through their attorneys, Je Yon Jung, of May Jung, LLP, and Olu Orange, of Orange Law Offices, P.C., allege as follows:

## I.    INTRODUCTION

1. Plaintiff Barry Williams was 19 years old when he was arrested for the murder of Donald Billingsley. The charges against Plaintiff Barry Williams were dismissed for lack of sufficient evidence. Not to be deterred, law enforcement officers, detectives and prosecutors were determined to find evidence to convict Mr. Williams.

2. Not long after the murder of Billingsley, there was another gang related murder of another young African American man, Jerome Dunn, in South Central Los Angeles. Once again, Defendants set their sites on Plaintiff Barry Williams as the primary suspect, even without any solid evidence against him.

3. Defendants proceeded to fabricate inculpatory evidence and suppress exculpatory evidence related to the two murders against Plaintiff Barry Williams.

4. Ultimately, Plaintiff Barry Williams was convicted for the Billingsley murder and it was used as the sole enhancement for the Dunn murder conviction, resulting in Plaintiff Williams being sentence to the death penalty.

5. Plaintiff Williams spent 41 years of his life incarcerated—32 of those years on death row in a 4x10 foot cell. He was 62 years old when he was released.

His son, Plaintiff Damien Williams was 2 years old when his father was incarcerated. He was 43 years old when his father was released.

6. This civil rights action concerns the unlawful and unconstitutional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution and the laws of the State of California. Such deprivations are related to the wrongful investigation, arrest, prosecution, conviction, and incarceration of Plaintiff Barry Williams for 41 years, 32 of which were on death row.

## II.    JURISDICTION AND VENUE

7. This action is brought by Barry Glenn Williams ("Barry") and Damien Deron Williams ("Damien") (hereinafter collectively "Plaintiffs") pursuant to 42 U.S.C. § 1983.

8. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(4) for violations of the 1871 Civil Rights Enforcement Act, as amended, including 42 U.S.C. § 1983.

9. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a);

10. Venue properly lies in the United States District court for the Central District of California pursuant to 28 U.S.C. § 1391(b) in that this is the District in which the claims arose.

11. Plaintiffs' state law causes of action arise under the general laws and Constitution of the State of California. Plaintiffs have complied with the California Tort Claims Act requirements.

### III.    JURY DEMAND

12. Plaintiffs demand a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure 38(b).

### IV.    PARTIES

13. Plaintiff BARRY GLENN WILLIAMS is an adult African American male who was born on April 4, 1962, in Compton, California, and was, at all times relevant to this Complaint, a resident of the State of California.

14. Plaintiff DAMIEN DERON WILLIAMS is an adult African American male who was born on July 2, 1980, in Watts, California. He eventually left California and moved to Texas and is now a resident of Texas.

15. Defendant LOS ANGELES COUNTY ("County") is a duly constituted governmental entity in the State of California, and is, or was, the employer of all individually named Los Angeles Sheriff's Department deputies and including, but not limited to, those who are sued in their individual and official capacities, as well as one, or all, of Defendant DOES 1 through 10.  The Los Angeles District

Attorney's Office ("LADA") and the Los Angeles County Sheriff's Department ("LASD") are, and at all times herein alleged were, agencies of Los Angeles County. This Defendant is sued in its own right for County policies, practices and/or customs which caused Plaintiffs' injuries in violation of one or more federal constitutional guarantees, and on Plaintiffs' state law claims based on *respondeat superior*, under California Government Code §815.2 and mandatory duties under California Government Code §815.6.

16. Defendant CITY OF LOS ANGELES ("City") is a public entity organized and existing under the laws of the State of California and is, or was, the employer of all individually named Defendant Los Angeles Police Department deputies and/or investigators including, but not limited to, those who are sued in their individual and official capacities, as well as one, or all, of Defendant DOES 1 through 10. Defendant Los Angeles Police Department ("LAPD") is a duly formed agency of the City. This Defendant is sued in its own right for City policies, practices and/or customs which caused Plaintiffs' injuries in violation of one or more federal constitutional guarantees, and on Plaintiffs' state law claims based on *respondeat superior*, under California Government Code §815.2 and mandatory duties under California Government Code §815.6.

17. At all times relevant herein, Defendant CARMEN TRUTANICH ("Trutanich") was a Deputy District Attorney at the LADA acting under color of

law. For the conduct regarding Trutanich, he was acting in either an investigative or administrative capacity and was not acting in a prosecutorial capacity. He is sued in his individual capacity.

18. At all times relevant herein, Defendant JAMES JACOBS ("Jacobs") was a Deputy District Attorney at the LADA acting under color of law. For the conduct regarding Jacobs, he was acting in either an investigative or administrative capacity and was not acting in a prosecutorial capacity. He is sued in his individual capacity.

19. Upon information and belief, MIGUEL AKA "MICHAEL" AKA "MIKE" MEJIA ("Mejia") is deceased.  At all times relevant herein, Defendant Mejia was an investigating officer with the Los Angeles Police Department acting under color of law. He and/or his estate is sued in his or its individual capacity. Because Mejia is deceased, Plaintiffs are naming the ESTATE OF MIGUEL MEJIA as the defendant and will seek leave to amend to name the personal representative of the estate as a defendant as soon as the personal representative's identity is determined. The Defendant Estate of Miguel Mejia and the personal representative of Mr. Mejia's estate are entitled to defense and indemnification by the State of California and/or the CITY and/or the COUNTY. California Probate code § 550 et seq. permits claims directly against an indemnified estate without the need to join the decedent's personal representative or successor in interest as a

party. To the extent that a personal representative or successor in interest is a necessary party, the identity of that person is currently unknown to Plaintiffs and is sued as a Doe Defendant.

20. At all times relevant herein, Defendant JOE HOLMES ("Holmes) was a deputy with the Los Angeles Sheriff's Department acting under color of law. He is sued in his individual capacity.

21. At all times relevant herein, JIM BELL ("Bell") was an investigator employed by the LADA acting under color of law. He is sued in his individual capacity.

22. Plaintiffs are ignorant of the true names and capacities of defendants sued herein as DOEs 1 through 10, inclusive, and therefore sue these defendants by such fictitious names. Upon information and belief, DOEs 1 through 10, were employees for Los Angeles County and/or City and were at all relevant times acting in the course of their employment and agency and under color of law. Each Defendant is the agent of the other. Plaintiffs will give notice of this complaint, and of one or more DOEs' true names and capacities, when ascertained. Plaintiffs allege, based on  information and belief, that defendants DOEs 1 through 10 are responsible in some manner for the damages and injuries hereinafter complained of.

# V.    PROCEDURAL BACKGROUND

23. Donald Billingsley ("Billingsley") was murdered on June 16, 1981.

24. Jerome Dunn ("Dunn") was murdered on March 25, 1982.

25. A Criminal Information was filed against Plaintiff Barry Williams on May 20, 1982, charging Plaintiff Barry Williams with the murder of Billingsley ("Criminal Information I").

26. Criminal Information I was dismissed for insufficient evidence on July 22, 1982.

27. That same day on July 22, 1982, the State filed an expanded Criminal Information re-charging Plaintiff Barry Williams with the murder of Billingsley (Count I), two counts of attempted murder against Carol Freeman and Anthony DuBose on June 16, 1981 (Counts II and III); and adding the murder of Jerome Dunn (Count IV). ("Criminal Information II").

28. On October 5, 1982, the State filed an amended Criminal Information and added a count of conspiracy to commit assault with a deadly weapon and murder related to the Billingsley murder charges (Count V).

29. Plaintiff Barry Williams pleaded not guilty to all counts contained in Criminal Information II, as amended.

30. On February 12, 1985, Plaintiff Barry Williams' trial for the Billingsley murder, among other counts, commenced.

31. On March 5, 1985, after three days of deliberations, Plaintiff Barry Williams was found guilty of first-degree murder, attempted murder, and conspiracy to commit murder on the Billingsley-related counts (Counts I, II, III, and V).

32. On May 13, 1985, Plaintiff Barry Williams was sentenced to 34 years to life in state prison for the Billingsley-related counts.

33. On May 13, 1985, the Stated filed another amended criminal information adding a sole "special circumstance" allegation pursuant to Penal Code 190.2(a)(2), based on Plaintiff Barry Williams' prior murder conviction of Billingsley.

34. Plaintiff Barry Williams' trial on the Dunn murder, Count IV, began on October 16, 1985.

35. Plaintiff Barry Williams was found guilty of first-degree murder of Dunn murder on January 17, 1986.

36. Plaintiff Barry Williams was sentenced to the death penalty for the first-degree murder of Dunn on July 11, 1986.

37. The sole special circumstance was that Plaintiff Barry Williams had been previously convicted of the June 16, 1981 Billingsley murder.

38. On appeal, the California Supreme Court affirmed Plaintiff Barry Williams' conviction and sentence on the Dunn conviction. The Supreme Court denied certiorari.

39. On November 21, 1995, Plaintiff Barry Williams filed his first state habeas petition on the Dunn conviction. The California Supreme Court denied Plaintiff Barry Williams' state habeas petition on September 18, 2000.

40. On December 23, 2003, Plaintiff Barry Williams' first amended federal habeas petition on the Dunn conviction was deemed filed.

41. On March 29, 2016, Plaintiff Barry Williams' federal habeas petition on the Dunn conviction was granted, concluding he was entitled to habeas relief because "the magnitude of the prosecution's combined substantial errors," left the Court with "no confidence in the jury's verdict." Accordingly, the Court vacated Plaintiff Barry William's murder conviction for the Dunn murder and the sentence of death. The matter was remanded to the superior court for possible retrial.

42. The Court further based its findings on the following: (1) false testimony presented at the pretrial *Massiah* hearing regarding Arthur Cox's testimony; and (2) Patricia Lewis's false testimony regarding the identity of the driver of the car. Accordingly, the judgment of conviction and sentence of death in the matter of *People v. Barry Glenn Williams*, Case No. A623377, in the California Superior Court for the County of Los Angeles was vacated.

43. In around June 2016, Plaintiff Barry Williams was transferred from San Quentin (death row) to Los Angeles County Jail, Men's Central Jail location in downtown Los Angeles, California.

44. Five years later, in January 2021, the People finally dismissed the Dunn murder charge against Plaintiff Barry Williams.

45. In March 2022, Plaintiff Barry Williams filed a Habeas Petition of Actual Innocence related to the Billingsley murder conviction.

46. During the pendency of the habeas petition, the state entered into an agreement with Plaintiff Barry Williams to release him based on "extraordinary efforts toward rehabilitation and self-improvement while incarcerated" and a resentencing petition pursuant to Penal Code section 1172.1.

47. Accordingly, on or about May 1, 2023, Plaintiff Barry Williams's murder conviction of Billingsley was dismissed.  As part of the stipulation, Plaintiff Barry Williams was charged with voluntary manslaughter and was resentenced to the mid-term of four (4) years for the voluntary manslaughter conviction plus one-third of the mid-term for the two counts of attempted murder he was already convicted of which would add four (4) years and eight (8) months to the four (4) years for a total new sentence of eight (8) years and eight (8) months, with credit to be given for the time he has already served in custody.

48. On May 1, 2023, the Court ordered Plaintiff Barry Williams' previous conviction and life sentence for the Billingsley murder conviction vacated.

49. On May 1, 2023, the Court sentenced Plaintiff Barry Williams to a total sentence of eight (8) years and eight (8) months and found that he would receive credit for time served on this sentence "as he has been in custody for 41 years." Plaintiff Barry Williams was not given any parole requirements upon release.

50. Plaintiff Barry Williams was not released from incarceration until May 8, 2023—after 41 years of incarceration—nearly 32 of those years on death row.

## VI.     GENERAL ALLEGATIONS

51.     At all relevant times, each and every Defendant was the agent and/or employee and/or co-conspirator of each and every other Defendant and was acting within the scope of such agency, employment and/or conspiracy and/or with the permission and consent of other co-Defendants and/or at the direction of the other co-Defendants and/or committed acts/omissions that were ratified by the other co-Defendants.

52.     Each of the Defendants caused and is responsible for the unlawful conduct and resulting injury herein alleged by, inter alia, personally participating in the conduct; acting jointly and/or in concert with the conduct of others; authorizing and/or acquiescing to the conduct; failing to intervene and/or take action to prevent the conduct; promulgating policies, procedures, and/or practices including training

pursuant to which the conduct occurred; failing to promulgate policies, procedures, and/or practices which would have prevented the conduct; failing to initiate and maintain adequate training, supervision, policies, procedures and/or protocols; failing to implement and ensure compliance with policies, procedures and/or practices to prevent the violation of the rights of individuals, such as Plaintiffs; and/or ratifying the conduct of persons under their direction and control.

53.    Whenever and wherever reference is made in this complaint to any act/omission by a Defendant, such allegation and reference will also be deemed to mean the acts and omissions of each Defendant individually, jointly, and/or severally.

54.    Each paragraph of this complaint is expressly incorporated into each cause of action which is a part of this complaint.

## VII.    FACTUAL ALLEGATIONS

### A. Dunn

55. Jerome Dunn was shot and killed on the evening of March 25, 1982, around 6:30 p.m. in South Central Los Angeles.

56. Kenneth Hayes and Jerome Dunn were riding their bicycles to see their girlfriends.

57. The sun was setting and it had just started to mist and rain.

58. A blue van, that had been previously reported as stolen, stopped next to Dunn, who was still on his bicycle.

59. Dunn appeared to be approximately three feet from the van, on the side of the driver of the van, talking to someone in it for a few minutes.

60. Someone's right hand—to the elbow—came out of the driver's window and shot Dunn four or five times.

61. Hayes was only a few feet away from Dunn when he was killed. Hayes was not able to see inside the van.

62. Shortly after the shooting, Hayes told Detective Mejia that a passenger in the van fired the shots.

63. Hayes testified at the preliminary hearing that he believed the shooter was the driver.

64. However, Hayes testified at trial and gave inconsistent testimony that he believed the passenger's right hand came out of the driver's window and shot Dunn four or five times.

65. The only witnesses to testify that Plaintiff Barry Williams was the driver of the van were Patricia Lewis, Arthur Cox, and John Gardner.

66. The only eye-witness to this shooting that named Plaintiff Barry Williams as the shooter was Patricia Lewis, who was the passenger in a station wagon that was near the intersection of the shooting.  However, the driver of the

station wagon—the only other eye-witness—was Jean Rivers aka Arlene McKay and, as outlined in further detail below, Ms. McKay was never disclosed by the prosecutors to Plaintiff Barry Williams or his attorney.

67. The other two key prosecution witnesses against Plaintiff Barry Williams were Arthur Cox and John Gardner--two jailhouse informants who testified regarding Plaintiff Barry Williams' purported comments to them about the Dunn murder.

**Witness Patricia Lewis**

68. Patricia Lewis testified that she was a passenger in a station wagon on the night of the shootings and that she witnessed the shots from the van that killed Dunn.

69. Lewis also testified that the driver of the car was Jean Rivers. This was false. The driver's true name was Arlene McKay.

70. McKay had passed away by the time Plaintiff Barry Williams filed his habeas petition, but was alive during the trial.

71. McKay's death certificate lists her address as the same home address noted in Mejia's notes contained in the "murder book."

72. Lewis lied to protect McKay because McKay did not want to get involved as a witness.

73. Trutanich knew or should have known that Lewis' testimony regarding McKay was false.

74. Plaintiff Barry William's trial counsel did not know that Jean Rivers was actually Arlene McKay or where she lived.

75. Trutanich and the prosecution did not provide Plaintiff Barry William's counsel copies of the notes pertaining to McKay/Rivers that were contained in the murder book, or any other information indicating that McKay was the same person as Rivers or her correct address.

76. Accordingly, impeachment evidence related to Lewis's eye-witness testimony against Plaintiff Barry Williams was suppressed or withheld by the State.

77. Trutanich never made it clear for the record that Jean Rivers was also known as Arlene McKay, although it was clear that Trutanich, at a minimum, suspected that the driver's name was McKay. Indeed, Trutanich knew that there was a second potential eye-witness in the vehicle, and that second eye-witness's identity was based on false information from his testifying eye-witness--Lewis.

78. Trutanich did not investigate, correct, or clarify Lewis's perjured testimony that Rivers was the name of the driver of the station wagon that night.

79. Detective Mejia knew who McKay was and he also likely interviewed McKay about the Dunn murder. In fact, their sole eye-witness Lewis stated in a 2008 declaration that McKay was interviewed by the police.

80. Trutanich's own handwritten pre-trial witness list demonstrates that the prosecution knew or should have known that Lewis's testimony as to the identity of the woman in the car with her on the night of the murder was actually false.

81. Trutanich failed to make clear for the record when Lewis was testifying that the second eye-witness was also known as McKay.

82. Lewis's eye-witness testimony was the lynchpin on the prosecution's case against Plaintiff Barry Williams.

83. The false testimony regarding the true identity of the second eye-witness directly impacted the fairness of Plaintiff Barry Williams' trial.

84. The fact that the second eye-witness (McKay) was not disclosed and/or pursued as a witness strongly indicates that her testimony would not have favored the prosecution's case against Plaintiff Barry Williams.

85. Lewis's entire testimony should have been subject to impeachment based on her inconsistent statements regarding the shooting in combination with her false statements regarding McKay.

**Arthur Cox**

86. Arthur Cox was a well-known jail house informant or snitch.

87. On July 15, 1982, prior to trial, Cox made a statement at the Los Angeles County Jail to LAPD detective Mejia and LASD deputy Holmes and LADA Jacobs.

88. Cox's statement was that Plaintiff Barry Williams had told him that Plaintiff Barry Williams had told Curtis, who was a passenger in the van, to shoot Dunn.

89. Shortly after the tape-recorded interview, LADA Jacobs wrote a draft of a Memorandum titled "Special Circs Penalty Evaluation" in which he discussed the facts and the prosecution's theory of the case against Plaintiff Barry Williams. In this memorandum, LADA Jacobs wrote that Plaintiff was "not the shooter" in the Dunn shooting. The memorandum reveals that the prosecution's theory was that Curtis Thomas was the shooter. There is at least one other memorandum written by Jacobs that references Cox's deal to testify against Plaintiff Barry Williams. Neither of these memoranda were disclosed to Plaintiff Barry Williams.

90. LADA Jacobs encouraged Cox to obtain inculpatory statements from Plaintiff Barry Williams now that the second preliminary hearing had been conducted: "If you talked to him now he would have a different thing to say about beatin it."

91. It was also clear that LADA Jacobs had made a deal with Cox to testify against Plaintiff Barry Williams as long as the district attorney's office would move Cox and his family and to assist Cox with his pending robbery case.

92. An undisclosed memorandum written by Jacobs emphasizes the importance of Cox's testimony in the prosecution of the Billingsley murder because Cox "placed a gun in defendant's hand," which Jacobs concedes is a weak case without this testimony. It also points out that without the testimony of Cox, the prosecution of Plaintiff Barry Williams for the murder of Dunn rests only on the testimony of Lewis.

93. On September 24, 1982, LADA Jacobs appeared for the People in the robbery case against Cox. The gun enhancement was stricken. Cox pleaded guilty and he was placed on three-years summary probation. The report stated that Cox had agreed to testify as a prosecution witness against Plaintiff Barry Williams.

94. On October 5 and 6, 1982, Cox testified for the prosecution against Plaintiff Barry Williams' pre-trial hearings. Cox also testified for the prosecution against Plaintiff Barry Williams in both the guilt phase and penalty phase of the Dunn shooting, January 3, 7, 8 and 29, 1986.

95. Contrary to the facts, LAPD detective Mejia testified at the pre-trial hearing that Cox initiated the first contact with him a week or a day prior to July

15, 1982, "probably on July 10, 1982," and that it was after the preliminary hearing on July 7 and 8, 1982. This testimony was false.

96. LAPD detective Mejia met with Cox between June 22 and June 27, 1982. Note that this meeting between Mejia and Cox was after the case against Plaintiff Barry Williams for the Billingsley murder was dismissed for lack of evidence on June 16, 1982, but before Plaintiff Barry Williams' preliminary hearing on July 7 and 8, 1982 for the Dunn murder.

97. While Cox's robbery charge was pending and in exchange for leniency regarding this robbery charge, LAPD detective Mejia initiated contact with Cox to obtain evidence against Plaintiff Barry Williams.

98. Shortly thereafter, Cox was moved to Plaintiff Barry Williams' unit or module.

99. Between 1982 and 1985, the Los Angeles County District Attorney's Office found 150 cases where an informant was placed next to an inmate and the informant testified against that inmate. The defense bar found more than 200 such cases. At the same time, there was no mechanism in place for keeping records of the movements of inmates.

100. LAPD detective Mejia gave false testimony regarding his contact initiation with Cox and the timing and frequency of his contact with Cox.

101. There was sufficient evidence to show that the State made a conscious decision to obtain Cox's cooperation and that Cox consciously decided to provide that cooperation.

102. LAPD detective Mejia and Cox knew that Cox was acting as an agent of the prosecution when he allegedly spoke to Plaintiff Barry Williams.

103. There is ample evidence that prosecutors and investigators engaged in a pattern or practice of misusing informants when Cox was being used as an agent of the state.

104. Cox was moved in June of 1982 to Plaintiff Barry Williams' module—within a few days after Cox's meeting with LAPD detective Mejia and nearly three months after Cox was incarcerated for his robbery charge.

105. LAPD detective Mejia's credibility was questionable and dubious based on his own inconsistent testimony.

106. Moreover, LAPD detective Mejia was part of the LAPD Community Resources Against Street Hoodlums ("CRASH") unit, an anti-gang unit with the Los Angeles Police Department found to have engaged in a pattern and practice of improper investigative tactics.

107. There is at least one unrelated instance where LAPD detective Mejia gave false statements in connection with an official investigation in an attempt to avoid discipline.

108. At a minimum, there is sufficient evidence to establish that the prosecution placed Cox next to Plaintiff Barry Williams for the purpose of obtaining incriminating statements and Cox deliberately elicited these statements from Plaintiff Barry Williams in violation of his constitutional rights.

109. The prosecution presented testimony from LAPD detective Mejia that was actually false.

110. The prosecution, through LADA Trutanich and LADA Jacobs, knew or should have known that that LAPD detective Mejia's testimony was actually false. At a minimum, this knowledge was either imputed to LADA Trutanich and LADA Jacobs, or LADA Trutanich himself testified that he reviewed the documents and notes in the murder book that were contrary to LAPD detective Mejia's testimony.

**Witness John Garnder**

111. John Gardner was a career informant for the Los Angeles Sheriff's Department.

112.  At Plaintiff Barry Williams' trial, Gardner testified that Plaintiff Barry Williams told him that he shot and killed Dunn.

113. After Plaintiff Barry William's conviction, Gardner gave deposition testimony in 2008 that LASD Deputy Holmes, LADA detective Bell, and LADA Trutanich met with him and offered him a deal regarding a pending robbery charge

for which he faced up to five years in prison, if he testified against Plaintiff Barry Williams.

114. Gardner in 2008 recanted his trial testimony against Plaintiff Barry Williams.

115. Gardner provided LASD Deputy Holmes the information that Plaintiff Barry Williams told him that he shot and killed Dunn—three years after the Dunn murder.

116. As referenced above, there was additional testimony that the shooter was not Plaintiff Barry Williams and that it was a passenger in the van by the name of Curtis Thomas.

117. Notwithstanding multiple sources identifying Thomas as the shooter, LAPD detective Mejia acknowledged that no criminal charges had ever been brought against Curtis Thomas for the shooting of Dunn, including Defendants' own informant, Cox, who testified for the prosecution that Plaintiff Barry Williams told him that he told Thomas to shoot Dunn.

**B. Billingsley**

118.  Donald Billingsley was shot and killed on the evening of June 16, 1981, at Green Meadow Park, located in South Central Los Angeles.

119. Plaintiff Barry Williams' conviction of the murder of Billingsley constituted the sole special circumstance allegation against Plaintiff Barry

Williams in the Dunn murder conviction, as well as the chief aggravator at the penalty phase of Plaintiff Barry Williams' capital trial.

120. Defendants had statements from another individual—Willie Bridges, Jr.—that he was one of five persons who went to the park on June 16, 1981, with guns and shot into a crowd, killing Billingsley. Plaintiff Barry Williams was not among them.

121. Several witnesses testified that Plaintiff Barry Williams was at a party at a different location on the night of the murder of Billingsley.

122. Key witnesses in Plaintiff Barry Williams' trial for the Billingsley murder conviction perjured themselves: Kenneth Gardner, Steve Wallace, Larry Russell, and Lea Stoneham.

**Steve Wallace**

123. Steve Wallace signed a declaration explaining that he lied when he testified that he saw Plaintiff Barry Williams on the night of the shooting. In addition, Wallace now declares that there was a conspiracy to frame Plaintiff Barry Williams for the killing of Billingsley. The participants in this conspiracy were the Green Meadows Park Boys, their associates, and the friends and relatives of the victim. This conspiracy resulted in the perjured testimony of Lea Stoneham, Larry Russell, and Kenneth Gardner, in addition to the perjured testimony of Steve Wallace.

124. Wallace's declaration further provides evidence that that he lied when he stated that the LADA did not promise him anything in return for his testimony and that the LADA knew that Wallace was lying. The LADA did not do anything to correct the record.

125. The prosecution also failed to disclose that Wallace was serving a penitentiary sentence at the time of Plaintiff Barry William's trial. Wallace obtained a promise from the prosecution that he would be able to get married to Monique Brown so that he would be allowed conjugal visits for the rest of his time in the penitentiary. This was not disclosed to Plaintiff Barry Williams or his counsel.

126. In addition, at the time of his testimony at the trial against Plaintiff Barry Williams, Wallace had a pending charge against him for armed robbery of another prisoner.

127. The preliminary hearing in Wallace's armed robbery case was scheduled for March 8. When LADA Trutanich secured an order for Wallace to be transported to the Compton courthouse, the alternative dates specified were March 8 or March 11. On March 11, 1985, the case against Wallace was dismissed. On information and belief, Wallace's deal with the prosecution included a deal for this favorable resolution of the pending armed robbery case. The prosecution failed to disclose the existence of this inducement for Wallace's testimony.

**Larry Russell**

128.  Russell provided a statement on the night of the Billingsley shooting that he saw Tommy Bridges carrying a sawed-off shotgun and did not implicate Plaintiff Barry Williams at the scene during or after the shooting.

129. Russell made another out-of-court statement on September 15, 1981, consistent with his prior statement that Plaintiff Barry Williams was not at the scene during or after the shooting.

130. Russell perjured himself at trial and made statements inconsistent with his prior two statements and testified that he saw Plaintiff Barry Williams fleeing from the park just after the shooting.

131. In a post-conviction habeas investigation and re-interview of Russell, he stated that he did not see Plaintiff Barry Williams fleeing from the park— consistent with his prior out-of-court-statements and inconsistent with his trial testimony.

132. Russell also testified that he was one of the Green Meadows Park Boys and; thus, is consistent with Wallace's declaration that naming Plaintiff Barry Williams was part of the conspiracy to frame Plaintiff Barry Williams.

**Kenneth Gardner**

133.  Gardner made several out-of-court statements to the police in which he failed to identify anyone. Shortly after the shooting, he provided a description to an

officer, who wrote the description on an field identification card ("FI card"). However, the prosecution did not disclose this FI card to the defense. Gardner provided another statement early on the morning of June 17, 1981. In a third interview with police on July 8, 1981, Gardner was shown photographs of Plaintiff Barry Williams and Willie Bridges, but Gardner again failed to make an identification.

134. During the first preliminary hearing on May 6, 1982, Gardner was subpoenaed but did not testify. The prosecutor did not call Gardner to testify because he could not identify Plaintiff Barry Williams as the shooter.

135. Gardner did testify for the prosecution in the second preliminary hearing on July 8, 1982.  Gardner testified that the person who ran by him carried a sawed-off shotgun. He also testified that he would be able to recognize the person who ran by him but he did not see anybody in court that he recognized. Plaintiff Barry Williams was in the courtroom. He also testified that he would not be able to recognize the three individuals who were running east on 90th Street.

136. At trial, however, Gardner identified Plaintiff Barry Williams as the person who ran by him immediately after the shooting while carrying a weapon. He testified that saw that the individual had a silver tooth. Gardner's testimony was perjured.

137. Subsequent to Plaintiff Barry Williams' conviction, Gardner signed a declaration admitting that he did not see a silver tooth himself. He also acknowledged that his testimony amounted to "going with the flow" of sentiment among the people in his neighborhood. He stated that he did not know that the person he identified in court was the person who ran by him on the night of the shooting.

138. Gardner's subsequent declaration is consistent with Wallace's declaration that naming Plaintiff Barry Williams was part of the conspiracy to frame Plaintiff Barry Williams.

**Lea Stoneham**

139. Stoneham was interviewed on the night of the shooting. She gave general physical descriptions of two suspects, but she stated that she did not recognize either or them nor could she identify either of them.

140. A few weeks after the shooting, Stoneham identified Plaintiff Barry Williams as the shooter.

141. Four witnesses who were with Stoneham that evening have signed declarations that Stoneham was not in a position to see the shooters, that she was significantly farther away than she testified, and that shortly after the shooting Stoneham never identified Plaintiff Barry Williams as part of the shooting.

142. Stoneham has acknowledged to others that she perjured herself when she testified against Plaintiff Barry Williams at trial.

143. The prosecution failed to disclose information that was relevant to impeaching her testimony, including, but not limited to: prosecution threatened to put Stoneham in jail if she did not provide the testimony prosecutor expected; Stoneham was on medication of psychiatric disorders; and Stoneham had a drug addiction and had several children. Upon information and belief, she was threatened by the prosecution that she would lose her children if she did not testify against Plaintiff Barry Williams.

144. Prosecution failed to disclose a statement that Stoneham made to police a week after the Billingsley murder. This statement was not disclosed to Plaintiff Barry Williams.

145. Prosecution failed to disclose a statement by Billingsley brother, Larry Billingsley, in which Margo Bridges told Larry Billingsley that her brother killed Donald Billinsley.  Margo Bridges has two brothers, Willie and Tommy Bridges. This statement was not disclosed to Plaintiff Barry Williams. Notably, this statement is consistent with Willie Bridges' statement that he and his brother Tommy Bridges were the shooters.

**Arthur Cox**

146. Arthur Cox—the same Arthur Cox who provided false inculpatory evidence against Plaintiff Barry Williams in the Dunn conviction--testified that he attended a meeting and that Plaintiff Barry Williams was there along with a number of other individuals all purportedly members of the 89th Street Family Bloods.

147. According to Cox, the meeting was to arrange the shooting at Green Meadow Park against rival Crips gang members.

148. According to Cox, he further testified, that the day after the shooting, he attended another meeting with Plaintiff Barry Williams and the same attendees during the "planning" meeting.

149. Cox subsequently signed a declaration admitting that he lied about the planning meeting.

150. The prosecutor's file contains handwritten notes of an interview with Cox on January 5, 1983 at SBC (or LAPD South Bureau CRASH). The notes indicate that Cox stated that he was no longer in the 89 Family Bloods on July 12, 1981. This is contrary to his testimony that he was "invited" to an 89 Family Bloods meeting where Plaintiff Barry Williams directed the shooting. In addition, the notes indicate that Cox requested assistance for his brother, Ernest Cox, to be placed in a medium security prison like Tehachapi. Ernest Cox was transferred to

Tehachapi shortly after Arthur Cox provided testimony against Plaintiff Barry Williams. None of this information was disclosed to Plaintiff Barry Williams.

151. LAPD detective Mejia's notes were contained in the murder book and implicated Cedric Parker as one of the shooters. However, Parker was not included in a subsequent taped interview or in Cox's testimony against Plaintiff Barry Williams.  Upon information and belief, these notes were made by LAPD detective Mejia during his conversations with Cox, which predated the July 15, 1982, interview with Cox that was tape recorded. These notes were not disclosed to Plaintiff Barry Williams. Had they been disclosed, they would have provided evidence of Mejia and Jacobs' false presentation of evidence by Cox.

152. Prosecutors failed to disclose FI cards, which contain names, addresses, and photographs of potential witnesses regarding the shooting that night.

153. Prosecutors failed to disclose post-it notes from investigators that stated Valerie Walker and Cynthia Twitty each separately stated that Plaintiff Barry Williams "did not do it!" However, the LADA investigator Jim Bell drafted a typed report summarizing his interview with Twitty, which was disclosed to the defense, but failed to include the exculpatory information.

154. Moreover, Cox also lied about an out-of-court statement from Eddie Davis that purported to recount an inculpatory statement by Plaintiff Barry Williams.

155. Eddie Davis testified that he was pressured to say certain things, after he had been arrested while on probation, and threatened with a murder charge if he did not agree.

156. The prosecution introduced an out-of-court-statement of Eddie Davis that he did not admit to providing at trial.

157. The out-of-court-statement provided that Davis stated that Plaintiff Barry Williams said that he participated in the shooting at the park and that he hit Don Billingsley, Billingsley is dead, and that Plaintiff Barry Williams thought he hit Steve, too.

158. Notably, Eddie Davis's unreliable and false statements was introduced through LAPD detective Mejia, whose veracity and credibility have also been called into question in the Dunn murder, as set forth above.

159. The Davis statement was the product of an illegal arrest followed by a coercive in-custody interrogation.

## VIII.    PARTICIPATION, STATE OF MIND, AND DAMAGES

160. With respect to the acts and/or omissions alleged herein, each individual Defendant acted illegally and without authorization.

161. Each individual Defendant participated in the violations alleged herein, and/or directed the violations alleged herein, and/or knew or should have known of

the violations alleged herein and failed to act to prevent them. Each Defendant ratified, approved or acquiesced in the violations alleged herein.

162. As joint actors with joint obligations, each individual Defendant was and is responsible for acts and/or omissions of the other.

163. Each individual Defendant acted individually and in concert with the other Defendants and others not named in violating Plaintiffs' rights.

164. With respect to the acts and/or omissions alleged herein, each Defendant acted deliberately, purposefully, knowingly, recklessly and/or with deliberate indifference. Each Defendant's acts and/or omissions were done with deliberate indifference to, or reckless disregard for, Plaintiffs' rights or the truth in engaging in the conduct alleged herein.

165. As a direct and proximate result of the described acts, omissions, customs, practices, policies, and decisions of the Defendants, Plaintiff Barry Williams was wrongfully arrested, prosecuted, convicted, and incarcerated for over forty-one years, thirty of those years on death row.

166. As a direct and proximate result of his wrongful arrest, prosecution, conviction, and incarceration, Plaintiff Barry Williams lost his liberty and the quality and enjoyment of his life both during his period of incarceration and thereafter.

167. As a direct and proximate result of his wrongful arrest, prosecution, conviction, and incarceration, Plaintiff Barry Williams has suffered, continues to suffer, and is likely to suffer in the future, extreme and severe mental anguish, mental and physical pain and injury, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension. For such injuries, he has incurred and will incur in the future significant damages.

168. As a direct and proximate result of his wrongful arrest, prosecution, conviction, and incarceration, Plaintiff Barry Williams has lost past and future earnings.

169. As a direct and proximate result of his wrongful arrest, prosecution, conviction, and incarceration, Plaintiff Barry Williams has been deprived of existing familial relationships, the society and companionship of existing friends and family, and the opportunity to raise his son or have additional children.

170. As a direct and proximate result of his wrongful arrest, prosecution, conviction, and incarceration, Plaintiff Barry Williams was brutally and physically assaulted multiple times during his incarceration. Injuries include but are not limited to a broken nose, concussion, back injury, dislocated/thrown-out shoulder and a broken leg resulting in several months in a wheelchair. Plaintiff Barry Williams' leg was broken by Los Angeles Sheriff's Department Officers in approximately 1982. Plaintiff Barry Williams was intentionally placed by Los

Angeles Sheriff's Department in areas where he would be physically attacked and potentially killed by other inmates due to the nature of the false allegations against him. Plaintiff Barry Williams' concussion caused a vertigo condition which lasted multiple years and caused him emotional trauma. Los Angeles Sheriff's Department Officers also intentionally delayed medical care to Plaintiffs.

171. The acts and/or omissions of Defendants, and each of them, were willful, wanton, malicious, oppressive, in bad faith, and done knowingly, purposefully, and/or with deliberate indifference to and/or reckless disregard for Plaintiffs' constitutional rights or the truth, entitling Plaintiff Barry Williams to exemplary and punitive damages from each individual Defendant.

172. By reason of the acts and/or omissions of the Defendants, and the injuries caused thereby, Plaintiff Barry Williams was required to retain an attorney to institute and prosecute the within action, and to render legal assistance to Plaintiff Barry Williams, that he might vindicate the impairment of his rights and resulting injuries. By reason thereof, Plaintiff Barry Williams requests payment by Defendants of reasonable attorney's fees and costs.

173. Plaintiff Barry Williams specifically alleges that Defendants' policies, customs and/or practices, as described herein above, were within the control of Defendants and within the feasibility of Defendants to alter, adjust and/or correct

so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiff Barry Williams.

174. Plaintiff Barry Williams specifically alleges that Defendants, and each of them, made a calculated, knowing and voluntary choice not to alter, adjust and/or correct their policies, customs and/or practices, as described herein above, so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiff Barry Williams. The conduct by Individual Defendants was with malice, fraud and/or oppression, and said defendants are therefore liable for punitive damages.

## IX.    EQUITABLE ESTOPPEL

175. Plaintiff Barry Williams' murder conviction in the Dunn matter was vacated on March 29, 2016.

176. Plaintiff Barry Williams' charges related to the Dunn matter were not dismissed for nearly five years, in January 2021.

177. Plaintiff Barry Williams was relocated to Los Angeles County Jail, Men's Central Jail location in downtown Los Angeles, from death row in around June 2016, but he remained incarcerated based on the Billingsley murder charges.

178. Plaintiff Barry Williams filed a state habeas petition of actual innocence related to the Billingsley conviction on March 2, 2022.

179. During the pendency of his state habeas petition related to the Billingsley conviction, the LADA Office actively delayed proceedings, including a minimum of seven continuances and at least one failure to appear for court-mandated in-person conference before Judge Allen Webster, further delaying efforts to resolve Plaintiff Barry Williams' state habeas petition and securing release.

180. Eventually, the LADA engaged in negotiations with Plaintiff Barry Williams to release him in accordance with Penal Code section 1172.6 solely due to his "extraordinary efforts toward rehabilitation and self-improvement while incarcerated."

181. Plaintiff Barry Williams was nineteen years old when he was incarcerated and was 61 years old in May 2023. He had spent nearly 32 years on death row.

182. While incarcerated, including on death row with the ultimate penalty of death over his future fate, Plaintiff Barry Williams attended educational classes upon his arrival in prison and earned the following certificates while in CDCR custody residing on death row in San Quentin:

- Certificate of Congratulations, Academic Achievement, The Mayor of the City of Oakland, 06/23/2011;

- Certificate of Achievement, Associate in Arts, Robert E. Burton Adult School and Coastline Community College, 06/23/2011;

- Certificate of Achievement, Coastline Community College, General Business.

183. Plaintiff Barry Williams was in the process of earning his bachelor's degree when he was transferred to Los Angeles County Jail after the Dunn conviction was vacated.  He continued the pursuit of his bachelor's degree while in the county jail.

184. While there, he also earned the following certificates between 2016 and 2022:

- Five Keys, Certificate of Completion, Construction Trades Math 1, 12/11/2017;

- Five Keys, Certificate of Completion, Anger Management/Domestic Violence, 4/6/18;

- Malachi Dads, Certificate of Completion, 6/2/18;

- Malachi Dads, Certificate of Completion, 12/17/16;

- Five Keys, Progress Report, Job Skills Prep, all excellent and good marks, 10/27/16;

- Five Keys, Certificate of Completion, Anger Management/Domestic Violence, 4/21/17;

- Five Keys, Certificate of Completion, Computers for Work 2, 4/21/17;

- Malachi Dads, Certificate of Completion, 5/27/17;

- Five Keys, Certificate of Completion, Substance Abuse, 2/24/17;

- Five Keys, Certificate of Completion, Computers for Work 1, 2/24/17;

- Five Keys, Certificate of Completion, Commercial Painting 1, 2/16/18;

- Malachi Dads, Certificate of Completion, 12/16/17;

- LA Men's Central Jail, School of Ministry, Certificate of Completion, 6/14/17;

- Five Keys, Certificate of Completion, Transitional Life Skills, 7/19/17;

- Five Keys, Certificate of Completion, Parenting, 5/31/17;

- Five Keys, Certificate of Completion, Commercial Painting 1, 9/11/17;

- Center for Health Justice, Substance Abuse Prevention and Health Education, 12/19/17;

- LA County Sheriff's Department, Certificate of Completion, Moral Reconation Therapy, 8/17/18; and

- Merit Master Program.

185. On May 1, 2023, in accordance with Penal Code section 1172.6, and in exchange for his immediate release from prison after 41 years, Plaintiff Barry Williams' prior Billingsley conviction and sentence for first degree murder was vacated and he pled guilty to involuntary manslaughter (a new Count VI).

186. In addition, he was re-sentenced to the mid-term of four (4) years voluntary manslaughter conviction plus one-third of the mid-term for the two counts of attempted murder he was already convicted of which would add four (4) years and eight (8) months to the four (4) years for a total new sentence of eight (8) years eight (8) months with credit to be given for the time he had already served in custody.  In exchange, Plaintiff Barry Williams habeas' petition was dismissed with prejudice.

187. Plaintiff Barry Williams was released from state custody and incarceration on May 8, 2023.

188. Plaintiff Barry Williams timely filed a state tort claim for damages with the City of Los Angeles and the County of Los Angeles on November 8, 2023.

189. On November 16, 2023, the City of Los Angeles formally denied Plaintiff Williams' timely noticed claims.

190. On December 21, 2023, the County of Los Angeles issued a letter to counsel for Plaintiff Barry Williams stating: Plaintiff Barry William's claim "subject to the one-year filing requirement pursuant to Government Code Section

911.2, and activities that occurred before November 8, 2022, is being returned because it was not presented within one year after the event or occurrence as required by law." Further, the letter stated, Plaintiff Barry Williams' claim "subject to the six-month filing requirement pursuant to Government Code Section 911.2, and activities that occurred before May 8, 2023, is being returned because it was not presented within six months after the event or occurrence as required by law." Finally, the letter stated, Plaintiff Barry Williams' claim "subject to the one year filing requirement pursuant to Government Code section 911.2, and activities occurring **since November 8, 2022, and** as it pertains to allegations subject to the six-month filing requirement pursuant to Government Code section 911.2 and activities occurring since **May 8, 2023**, is under investigation. We will advise you upon completion of that investigation." (emphasis in original).

191. Without any update on the pending "investigation," on January 25, 2024, the County of Los Angeles issued another letter stating that "Notice is hereby given that the claim you presented to the County of Los Angeles, Board of Supervisors on **November 8, 2023**, as it pertains to activities occurring since **May 83 [sic] 2023**, was rejected by operation of law on **January 23, 2024**. No further action will be taken on that portion of the claim." (emphasis in original). There was no reference to the pending "investigation."

192. Based on the County of Los Angeles' correspondence, the County had no basis for rejecting Plaintiff Barry Williams' claims under 911.2 by merely *ipse dixit* claiming that any claims "as it pertains to allegations" subject to a one-year or six-month filing requirement were not timely filed. Moreover, it was clear that the County was acting in bad faith when it claimed in its December 21, 2023, letter that any allegations "as they pertain" to allegations subject to a one-year or six-month filing requirement are "under investigation." These representations, without any indication whatsoever regarding the County's determination of the actual allegations to which Plaintiff Barry Williams' notice "pertains," were intended to lull Plaintiff Barry Williams into believing that an investigation of his allegations was ongoing and to prevent him from filing a civil action within the purported requisite statutory time period—the expiration of which Plaintiff Barry Williams disputes. In fact, the County's second letter on January 25, 2024, waited two days to issue a subsequent letter wherein the purported requisite expiration of any allegations that may "pertain" to activities occurring since May 82 [sic], 2023, were rejected by "operation of law" on January 23, 2024.

193. Plaintiff Barry Williams relied upon these representations in the County's letter that it was conducting an investigation of his claims, irrespective of the County's arbitrary timeline references and disingenuous references to an "investigation," and that his claims had not yet been denied.

194. The County's January 25, 2024, letter wholly fails to address its representations in the December 21, 2023, letter that certain but unidentified "allegations" remained "under investigation. Indeed, it is unclear what the County was referencing when it stated Plaintiff Williams' claims were rejected "by operation of law."

195. In furtherance of the County's bad faith, on May 6, 2024, County representative Lieutenant John Silverstein, an LASD officer "investigating" Plaintiff Barry Williams' § 910 claims, called counsel for Plaintiff Barry Williams to discuss his ongoing "investigation" of Plaintiff Barry Williams' complaints outlined in his § 910 notice of claim. Thus, contrary to the language of the County's correspondence on January 25, 2024, and consistent with the County's correspondence on December 21, 2023, the County was and is still even today purportedly conducting an investigation of Plaintiff Barry William's claims and allegations set forth in his § 910 notice.

196. Plaintiff Barry Williams timely pursued any and all state claims as soon as possible upon his release. If there are delays attributable to Plaintiff Barry Williams, they were excusable.

197. Contrary to Plaintiff Barry Williams, Defendants engaged in egregious and serious miscarriages of justice by delaying Plaintiff Barry Williams' ability to vindicate any and all of his constitutional and statutory rights.

198. Indeed, as outlined above, it is reasonably alleged that Defendants' bad faith and acts are on full display when: a) the actual prosecutions of Plaintiff Barry Williams were riddled with multiple and concerted bad acts and misconduct; b) the Defendants had numerous opportunities to correct their errors through decades of state and federal habeas petitions; c) even after Plaintiff Barry Williams' conviction in Dunn was vacated in 2016, his criminal charges were not dismissed for another five (5) years; d) Plaintiff Barry Williams' Billingsley murder conviction was vacated as a result of another habeas petition resulting in a plea that would have only resulted in a 8 year and 8 month sentence – but that was provided only after 41 years of incarceration, 32 of those years on death row; and e) the County's duplicitous and confused "denials of claims" were intended to mislead Plaintiff Barry Williams regarding his statute of limitations requirements.

199. Based on the foregoing, Defendant County is not prejudiced by having to defend against Plaintiff Barry Williams' claims, within a mere 12 months of his release after 41 years of incarceration.

200. Plaintiff Barry Williams has complied with the California Tort Claims Act requirements. In accordance with fairness and justice, Defendants should be equitably estopped from arguing otherwise.

# X.    EQUITABLE TOLLING

201. Plaintiff Barry Williams realleges paragraphs outlined above in Section IX for Equitable Estoppel.

202. In accordance with Cal. Civ. Proc. Code section 352.1(a), Plaintiff Barry Williams is entitled to up to two (2) years of tolling based on his disability of imprisonment.

203.  It is important to note that this case involves egregious and multiple acts and omissions by government officials and representatives that directly caused the unconstitutional and wrongful imprisonment of Plaintiff Barry Williams for 41 years—32 of those years on death row.

204. Plaintiff Barry Williams timely pursued any and all state claims as soon as possible upon his release, notwithstanding the government's intentional delays and obfuscations.

205. Defendants were keenly aware of Plaintiff Barry Williams' claims through multiple wrongfully denied state habeas proceedings and a protracted federal habeas process that was unduly prolonged by the Defendants' own dilatory misconduct, if not intentional obstruction, to prevent Plaintiff Barry Williams from timely securing his overdue freedom and seeking any and all available remedies for the violation of his constitutional and statutory rights that he suffered for 41 years.

206. Accordingly, any applicable statute of limitations should be tolled under Cal. Civ. Proc. Code section 352.1(a) and in the interest of fairness and justice.

## XI.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**DEPRIVATION OF CIVIL RIGHTS**
**42 U.S.C. § 1983-Due Process**
**(Plaintiff Barry Williams Against All Individual Defendants**
**and DOES 1-10)**

207. Plaintiff Barry Williams realleges all foregoing paragraphs and any subsequent paragraphs contained in this complaint, as if fully set forth herein.

208. Defendants TRUTANICH, JACOBS, MEJIA, HOLMES, and BELL, while acting under color of law, caused Plaintiff Barry Williams to be deprived of his rights, privileges, and immunities secured by the Constitution and laws of the United States, including the Fourth, Fifth, Eighth, and Fourteenth Amendments, by, *inter alia*, fabricating evidence, failing to disclose material exculpatory evidence, failing to correct false evidence, and conducting a reckless investigation into the murder of Dunn. Defendants' acts and/or omissions that caused these violations were done with deliberate indifference to or in reckless disregard of Plaintiff Barry Williams' rights and the truth.

209.  Defendants TRUTANICH, JACOBS, MEJIA, HOLMES, and BELL, while acting under color of law, caused Plaintiff Barry Williams to be deprived of his rights, privileges, and immunities secured by the Constitution and laws of the United States, including the Fourth, Fifth, Eighth, and Fourteenth Amendments, by, *inter alia*, fabricating evidence, failing to disclose material exculpatory evidence, failing to correct false evidence, and conducting a reckless investigation into the murder of Billingsley. Defendants' acts and/or omissions that caused these violations were done with deliberate indifference to or in reckless disregard of Plaintiff Barry Wiliams' rights and the truth.

210. The false evidence asserted herein is comprised of material omissions as well as affirmatively false and misleading statements in police reports, documents, and testimony prepared or given in connection with the investigation of the Dunn murder.

211. The false evidence asserted herein is comprised of material omissions as well as affirmatively false and misleading statements in police reports, documents, and testimony prepared or given in connection with the investigation of the Billingsley murder.

212. Among other acts and omissions that violated Plaintiff Barry Williams' rights, as set forth throughout this Complaint, Defendants TRUTANICH, JACOBS, MEJIA, HOLMES, and BELL acted individually and/or in concert with

each other and others not named herein, including the fabrication of inculpatory evidence against Plaintiff Barry Wiliams in both the Billingsley and the Dunn murders, through the improper and unlawful use of Arthur Cox's false testimony, and the related acts and omissions regarding their communications with Cox.

213.  Among other acts and omissions that violated Plaintiff Barry Williams' rights, as set forth throughout this Complaint, Defendants TRUTANICH, JACOBS, MEJIA, HOLMES, and BELL acted individually and/or in concert with each other and others not named herein, including the fabrication of inculpatory evidence against Plaintiff Barry Wiliams in the Dunn murder by destroying and/or suppressing exculpatory and potentially exculpatory evidence related to Arlene McKay.

214. Among other acts and omissions that violated Plaintiff Barry Williams' rights, as set forth throughout this Complaint, Defendants TRUTANICH, JACOBS, MEJIA, HOLMES, and BELL acted individually and/or in concert with each other and others not named herein, including the fabrication of inculpatory evidence against Plaintiff Barry Wiliam's in the Billingsly murder, through the improper and unlawful use of false testimony from Kenneth Gardner, Steve Wallace, Larry Russell, and Lea Stoneham, and the related acts and omissions regarding their communications with Kenneth Gardner, Steve Wallace, Larry Russell, and Lea Stoneham.

215.  Among other acts and omissions that violated Plaintiff Barry Williams' rights, as set forth throughout this Complaint, Defendants TRUTANICH, JACOBS, MEJIA, HOLMES, and BELL acted individually and/or in concert with each other and others not named herein further includes but is not limited to reckless investigatory misconduct such as disregarding clear information incriminating more obvious suspects like Thomas in the Dunn murder and Willie and Tommy Bridges in the Billingsley murder.

216. Each Defendant knew or should have known the evidence was false, and the Defendant's conduct individually and/or in concert with each other or other unnamed individuals, was intentional and knowing, or alternatively, done with deliberate indifference to and/or reckless disregard for Plaintiff Barry Williams' rights or for their constitutional duty to seek the truth.

217. Defendants' misconduct, either individually and/or in concert with each other or other unnamed individuals, did not cease with Plaintiff Barry Williams' conviction but continued through his habeas petitions, thereby prolonging his wrongful incarceration.

218. The constitutional source against using false evidence is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff Barry Williams' due process rights were violated by the conduct alleged herein. Plaintiff Barry Williams brings this claim as both a procedural and a substantive due

process violation. To the extent that any court were to conclude that the source of Plaintiff Barry Williams' right to not have false evidence used against him is any constitutional source other than due process (such as the Fourth Amendment), this claim is brought on those bases as well.

219. Defendants were each jointly and severally responsible to not use false evidence against Plaintiff Barry Williams. Each engaged in, either individually and/or in concert with each other and/or other unnamed individuals, engaged in, knew about, or should have known about the acts and/or omissions that caused the constitutional deprivations alleged herein and failed to prevent them and/or ratified/approved them and/or acquiesced to them.

220. As a direct and proximate result of Defendants' actions, Plaintiff Barry Williams was wrongly arrested, detained, prosecuted, convicted, and incarcerated for more than 41 years (nearly 32 of those years on death row) and suffered other grievous injuries and damages set forth herein.

221. The aforementioned acts and omissions of Defendants were committed by each of them knowingly, willfully, maliciously, oppressively, and/or in reckless disregard of Plaintiff Barry William's rights. By reason thereof, Plaintiff Barry Williams is entitled to punitive and exemplary damages from Defendants according to proof.

222. Plaintiffs specifically allege that Defendants' complained of acts and/or omissions, were within each of their control, and within the feasibility of each of them, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiff Barry Williams.

**SECOND CLAIM FOR RELIEF**
**DEPRIVATION OF CIVIL RIGHTS**
**42 U.S.C. § 1983-Conspiracy**
**(Plaintiff Barry Williams Against All Individual Defendants**
**and DOES 1-10)**

223. Plaintiff Barry Williams realleges all foregoing paragraphs and any subsequent paragraphs contained in this complaint, as if fully set forth herein.

224. Defendants and others not named herein agreed among themselves to act in concert to deprive Plaintiff Barry Williams of his clearly established constitutional rights as protected by the Fourth, Fifth, and Fourteenth Amendments, including his right to be free from illegal seizure.

225.  Defendants, and each of them, conspired and agreed to commit the above-described deprivations of Plaintiff Barry Williams' constitutional rights and acted jointly and in concert to deprive Plaintiff Barry Williams of his rights to be free from unreasonable seizures, to due process, to a fair trial, and to be free from groundless criminal prosecutions based on false and unreliable evidence.

226. As outlined herein, in furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including, but not limited to the following:

a. Acting in concert to suggest, coerce, and/or fabricate statements regarding identification of Plaintiff Barry Williams in the Billingsley murder as the shooter, including, but not limited to, the false statement from Kenneth Gardner, Steve Wallace, Larry Russell, and/or Lea Stoneham;

b. Acting in concert to suggest, coerce, and/or fabricate statements regarding identification of Plaintiff Barry Williams in the Dunn murder as the shooter, including, but not limited to, the false statements from Cox and Lewis;

c. Acting in concert to suppress, destroy, and/or intentionally fail to disclose and/or investigate the identity and statements of Arlene McKay in the Dunn murder investigation;

d. Acting in concert to suggest, coerce, and/or fabricate false inculpatory statements by Cox (in both the Dunn and Billingsley murders); by Gardner in the Dunn murder; by Gardner in the Billingsley murder; Wallace in the Billingsley murder; Russell in the Billingsley murder; Stoneham in the Billingsley murder; and Davis in the Billingsley murder;

    e.  Acting in concert to suppress, withhold, or otherwise fail to investigate evidence inculpating other more likely suspects without an alibi, including, but not limited to Thomas in the Dunn murder and Willie and/or Tommy Bridges in the Billingsley murder.

227. As a direct and proximate result of Defendants' actions, Plaintiff Barry Williams was wrongly arrested, detained, prosecuted, convicted, and incarcerated for more than 41 years (nearly 32 of those years on death row) and suffered other grievous injuries and damages set forth herein.

228. The aforementioned acts and omissions of Defendants were committed by each of them knowingly, willfully, maliciously, oppressively, and/or in reckless disregard of Plaintiff Barry Williams' rights. By reason thereof, Plaintiff Barry Williams is entitled to punitive and exemplary damages from Defendants according to proof.

229. Plaintiffs specifically allege that Defendants' complained of acts and/or omissions, were within each of their control, and within the feasibility of each of them, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiff Barry Williams.

### THIRD CLAIM FOR RELIEF
### INTERFERENCE WITH FAMILIAL ASSOCIATION
### 42 U.S.C. § 1983
### (All Plaintiffs Against All Individual Defendants)

230.  Plaintiffs Barry Williams and Damien Williams reallege all foregoing paragraphs and any subsequent paragraphs contained in this complaint, as if fully set forth herein.

231. The Fourteenth Amendment guarantees Plaintiffs Barry Williams and Damien Williams the right to be free from government actions that interfere with their individual and collective rights to family integrity and prohibit unwarranted interference with the familial relationship.

232. Defendants TRUTANICH, JACOBS, MEJIA, HOLMES, and BELL interfered, prevented, and obstructed Plaintiff Barry Williams' ability, as a father, to associate with his family and his son, without interference by the state regarding his parent-child relationship.

233. Defendants TRUTANICH, JACOBS, MEJIA, HOLMES, and BELL interfered, prevented, and obstructed Plaintiff Damien Williams' ability, as a son, to associate with his family and his father, without interference by the state regarding his parent-child relationship.

234. Plaintiff Damien Williams was two years old when his father, Plaintiff Barry Williams, was wrongfully convicted and incarcerated. Plaintiff Damien

Williams was not physically reunited with his father until Damien was 43 years old.

235. At all times, each of the individual Defendants was acting under color of state law in the performance of his official duties.

236. Each of these Defendants' acts and omissions deprived each Plaintiffs of their particular rights under the Constitution and laws of the United States and constituted unwarranted government interference.

237. Defendants' actions or omissions caused interference with the constitutionally protected familial relationship and was for purposes of oppression and interference of the familial relationship.

238. Defendants had no legitimate interest in interfering with the Plaintiffs' parent-child relationship.

239. Defendants' actions or omissions violated Plaintiffs' familial association rights in their mutual companionship and nurturing interests.

240. Defendants' actions were intentional and with deliberate deprivation and/or indifference to the familial association interests of Plaintiffs.

241. Plaintiffs specifically allege that Defendants' complained of acts and/or omissions, were within each of their control, and within the feasibility of each of them, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiffs.

## FOURTH CLAIM FOR RELIEF
## DEPRIVATION OF CIVIL RIGHTS
### 42 U.S.C. § 1983-*Monell* Violations
### (Plaintiff Barry Williams Against Defendant County)

242.  Plaintiff Barry Williams realleges all foregoing paragraphs and any subsequent paragraphs contained in this complaint, as if fully set forth herein.

243.  At all relevant times, Defendant COUNTY and its agencies and subdivisions, including the LASD and LADA, possessed the power and authority to adopt policies and prescribe rules, regulations, and practices affecting the operation of LASD and/or LADA, as well as the actions of employees and/or agents of LASD and/or LADA, including customs, policies, and/or practices relating to police tactics, methods, investigations, arrests, evidence, and discovery; as well as to personnel supervision, performance evaluation, individual investigations, discipline, records maintenance, and/or retention.

244.  The COUNTY, through LASD and/or LADA, at the times relevant herein, had a custom, policy and/or practice of acting with deliberate indifference to Plaintiff Barry Williams' due process rights by failing to have adequate administrative systems or policies, and/or failing to train its employees and agents, regarding fabricated evidence, improper influence of witness testimony, and the deliberate disregard of relevant facts and evidence that would have avoided the deprivation of Plaintiff Barry Williams' constitutional rights.

245.   These customs, policies practices and failures were so closely related to the deprivation of Plaintiff Barry Williams' rights as to be a moving force that caused his wrongful conviction. Due to these customs, policies, practices and failures, Plaintiff Barry Williams was deprived of his right to a fair trial. Had LASD deputies and detectives and/or LADA investigators here been properly trained and supervised, and had there been proper systems and policies in place, they would not have fabricated evidence, improperly influenced witness testimony, or deliberately ignored relevant facts and evidence that would have led that would have avoided the deprivation of Plaintiff Barry Williams' constitutional rights.

246. In an unrelated case involving Scott Hamby, who was convicted of murder, former LASD Captain, John "Mike" Bauer, found that Hamby was wrongfully convicted as a result of judicial misconduct, prosecutorial misconduct, and law enforcement misconduct. Specifically, Bauer noted that LASD deputy Joe Holmes, the lead investigator in the case, had engaged in unconstitutional policing and made "a case which he knew and should have known was false."

247. Further, in 1996, Los Angeles County paid over $9 million dollars in fines and training costs to settle lawsuits that alleged that LASD deputies had formed a racist, neo-Nazi, white supremacist gang that engaged in racially motivated hostility toward Black and Latino criminal suspects and witnesses.

248. At a minimum, findings of widespread corruption and/or racist gangs within the LASD were not substantively reviewed for similar corruption in Plaintiff Barry Williams' case. This review should have included any and all actions related to Plaintiff Barry Williams and his wrongful convictions, including the key role of Jacobs—who was already identified as guilty of engaging in unconstitutional policing--and others.

249. Similarly, in accordance with a grand jury investigation of the use of jailhouse informants in the LASD jails cited failure to provide full disclosure of deals that were made with informants in exchange for their testimony. For example, the grand jury found that full disclosures were not made in an unspecified number of the 150-250 case in Los Angeles county from 1979-1988, in which jailhouse informants testified.

250. The grand jury investigation included evidence that informants used a variety of ploys to gather confidential information about a crime so that they could claim that a cellmate confessed, chiefly in murder cases; admissions by jailers and detectives that LASD placed known informants next to defendants; known subornation of perjury; and disclosures that the district attorney's office repeatedly relied on informants whom top administrators and other prosecutors knew to be unreliable.

251. Further, the grand jury made two formal findings:

a.   The Los Angeles County district attorney's office failed to fulfill the ethical responsibilities required of a public prosecutor by its deliberate and informed declination (refusal) to take the action necessary to curtail the misuse of jailhouse informant testimony.

b.   The Los Angeles County Sheriff's Department failed to establish adequate procedures to control improper placement of inmates, with the foreseeable result that false claims of confessions or admissions would be made.

252. The grand jury investigation also noted that courts have "sometimes lacked adequate factual information to fully realize the potential for untrustworthiness which is inherent in (jailhouse informant) testimony because of the strong inducements to lie or shape testimony in favor of the prosecution."

253. Further, the investigation noted evidence that LASD placed inmates next to accused criminal defendants for purposes of gathering inculpatory testimony.

254. In the LADA, the grand jury found, senior management had repeatedly refused to establish a central index on informants to keep track of their offers to testify and their reliability, despite requests to do so from subordinates.

255. In addition, one LADA management official testified during the grand jury proceedings that an informant index was regarded as a bad idea because it

might lead to discovery by defense attorneys of what he believed was a "fairly common practice" of the Sheriff's Department in planting informants next to suspects when "the amount of available evidence that we can present in court is a little on the thin side and a statement would certainly be helpful."

256. The grand jury investigation covered the period of 1979 to 1988, the period in which jailhouse informant Cox's testimony was used, if not the primary evidence, against Plaintiff Barry Williams in obtaining both of his convictions.

257. At a minimum, the grand jury findings related to the unethical use and disclosure of jailhouse information were not substantively reviewed for similar corruption in Plaintiff Barry Williams' case. This review should have included any and all actions related to Plaintiff Barry Williams and his wrongful convictions, including the key role of jailhouse informant Cox.

258. Plaintiff Barry Williams is informed and believes and thereon alleges that, during all or portions of the period relevant to this case, Defendant County of Los Angeles, by and through the LASD and/or LADA, acted with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of criminal suspects and defendants, including Plaintiff Barry Williams.

259. Defendant County of Los Angeles, by and through the LASD and/or LADA had a) no established or clear administrative system in place, b) no stated,

written or adequate policies, c) no or inadequate training and supervisions; and/or d) ignored written policies and procedures regarding, inter alia, the following issues:

a. Ensuring that any police department or police officers, including the LASD, with which the LADA was working provided all exculpatory evidence gathered during an investigation of a case presented to the LADA for prosecution, as numerous cases over the years made clear was its obligation;

b. Ensuring that any police department or police officers, including the LASD, with which the LADA was working provided its full investigative material and that material is actually reviewed by an appropriate Deputy DA;

c. Ensuring that exculpatory evidence was not buried in files provided to the trial attorney handling the case by the police department or police officers, including the LASD, with which the LADA was working, and/or by members of its Office;

d. Ensuring that the police department or police officers, including the LASD, with which the LADA was working provided to the trial attorney prosecuting that case full and complete reports of any benefits (including but not limited to benefits in the form of monetary or other pecuniary

benefits and leniency in other charges) provided to any witness, and/or that such information was disclosed to the defense;

e.  Ensuring that any benefits or monies paid to or for the benefit of witnesses was both known to the relevant people in the LADA, including the attorney assigned to try the case, and/or disclosed to the defense;

f.  Ensuring that false evidence was not being presented or relied upon by Deputy District Attorneys in prosecuting cases;

g.  Ensuring that the key law enforcement reports, including the LASD, and other key case documents provided full and complete descriptions of witness interactions and called attention to any irregularities, deviations from policy or evidence favorable to the defense;

h.  Ensuring that exculpatory evidence learned or discovered after trial and conviction (including between trial and sentencing and after sentencing) was disclosed to defendants and their counsel;

i.  Ensuring that exculpatory information known to Deputy District Attorneys would be identified, organized and maintained for production to the California Attorney General's Office for litigation in subsequent post-trial habeas and appellate proceedings;

j.  Establishing procedures or systems to track or identify known false witness statements or other known facts that would make them unsuitable

as witnesses in other cases or would be exculpatory evidence undermining their credibility if they were used as witnesses;

k. Failing to discipline personnel involved in dishonesty, particularly in enabling, encouraging, condoning or presenting false testimony that was known or should have been known to be false or that was utilized with a reckless disregard for, or deliberate indifference towards, the truth and the rights of the accused;

l. Establishing procedures so all exculpatory/impeachment evidence discovered by law enforcement or the LADA after the preliminary hearing stage is provided to the defense; and/or

m. Establishing procedures so all exculpatory/impeachment evidence discovered by law enforcement or the LADA after a conviction is provided to the defense.

260. The customs, policies, practices, failures, actions and inactions of the LADA and/or the LASD elaborated herein were or should have been known to the policy makers responsible for the LADA and/or LASD and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to adopt and implement systems, policies, training, supervision or discipline in areas where the need for such things to occur was obvious. Given

the long and recurring history elaborated above, the LADA and/or LASD and its policy makers were on notice of these deficiencies and failures.

261. The customs, policies, practices, failures, actions and inactions of the LADA and/or LASD elaborated above were so closely related to the deprivation of Plaintiff Barry Williams' rights as to be a moving force that caused the constitutional violations alleged herein.

262. As a direct and proximate result of the County's acts and/or omissions, condoning, encouraging, ratifying and deliberately ignoring the pattern and practice of district attorney's acts and omissions alleged above, Plaintiff Barry Williams sustained injury and damage to be proved at trial.

263. Plaintiff Barry Williams specifically alleges that Defendants' complained of acts and/or omissions, were within each of their control, and within the feasibility of each of them, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiff Barry Williams.

**FIFTH CLAIM FOR RELIEF**
**DEPRIVATION OF CIVIL RIGHTS**
**42 U.S.C. § 1983-*Monell* Violations**
**(Plaintiff Barry Williams Against Defendant City)**

264. Plaintiff Barry Williams realleges all foregoing paragraphs and any subsequent paragraphs contained in this complaint, as if fully set forth herein.

265. At all relevant times, Defendant CITY and its agencies and subdivisions of Defendant CITY, including the LAPD, possessed the power and authority to adopt policies and prescribe rules, regulations, and practices affecting the operation of LAPD, as well as the actions of employees and/or agents of LAPD, including customs, policies, and/or practices relating to police tactics, methods, investigations, arrests, evidence, and discovery; as well as to personnel supervision, performance evaluation, individual investigations, discipline, records maintenance, and/or retention.

266. The CITY, through LAPD, at the times relevant herein, had a custom, policy and/or practice of acting with deliberate indifference to Plaintiff Barry Williams' due process rights by failing to have adequate administrative systems or policies, and/or failing to train its employees and agents, regarding fabricated evidence, improper influence of witness testimony, and the deliberate disregard of relevant facts and evidence that would have avoided the deprivation of Plaintiff Barry Williams' constitutional rights.

267. These customs, policies, practices and failures were so closely related to the deprivation of Plaintiff Barry Williams' rights as to be a moving force that caused his wrongful conviction. Due to these customs, policies, practices and failures, Plaintiff Barry Williams was deprived of his right to a fair trial. Had LAPD officers and detectives here been properly trained and supervised, and had

there been proper systems and policies in place, they would not have fabricated evidence, improperly influenced witness testimony, or deliberately ignored relevant facts and evidence that would have led that would have avoided the deprivation of Plaintiff Barry Williams' constitutional rights.

268. The LAPD's CRASH unit—of which Defendant Mejia and unnamed conspirators were members--was notoriously exposed in the late 1990s as a law enforcement gang of officers who uniformly and routinely engaged in corrupt acts against criminal suspects and witnesses, including, but not limited to, planting evidence, coercing witnesses to provide false testimony, fabricating evidence, and suborning perjury.

269. A board of inquiry was convened in September 1999 by then LAPD chief Bernard Parks, and identified a lack of managerial oversight and included, among other things, unauthorized use of confidential informants as "troublesome."

270. As a result of the Ramparts/CRASH scandal, the City of Los Angeles faced more than 140 civil lawsuits with an estimated settlement cost of $125 million and the investigation resulted in overturning more than 100 cases; and 58 officers were brought before an internal administrative board, and subsequently 12 were suspended, seven (7) resigned; and five (5) were terminated. Upon information and belief, LAPD detective Mejia was implicated in one or more of the cases involving the CRASH corruption investigation.

271. In 2000, the United States Department of Justice, Civil Rights Division, ("DOJ") brought a civil action under 42 U.S.C. 14141, against the LAPD alleging a pattern or practice of excessive force, false arrests, and unreasonable searches and seizures in violation of the Fourth and Fourteenth Amendment to the Constitution. The allegations in the United States' Complaint are incorporated herein.

272. Moreover, the DOJ noted "serious deficiencies" in the training, supervision, investigations, and discipline of officers and that the LAPD failed to identify and respond to patterns of at-risk officer behavior. Specifically, the DOJ found the following: "First, LAPD supervisors fail to supervise adequately LAPD officers carrying out their routine policing responsibilities. Supervisors do not, to the extent necessary, direct, evaluate, and monitor officer performance in the field. Supervisors fail to respond to the scene of significant incidents; fail to adequately review reports, including arrest and booking reports; fail to ensure the integrity of applications for warrants and the use of confidential informants; and fail to ensure the appropriate treatment of persons in police custody. Many supervisors do not have the training necessary to perform their supervisory responsibilities and correct deficiencies. This failure in direct supervision has created an environment where officers may engage in misconduct without detection and intervention by LAPD supervisors."

273. In addition, the federal investigation included review of the following: LAPD policy statements; reports on officer-involved shootings and incidents in which non-lethal force was used; misconduct complaint files in which serious misconduct was alleged; information on civil suits filed against the LAPD and its officers; information on criminal charges filed against LAPD officers; information relating to police training; and reports and memoranda prepared by the LAPD, the Board of Police Commissioners ("Police Commission"), and the Inspector General that discuss or analyze reform initiatives.

274. Further, the DOJ found "that the LAPD's pattern or practice of police misconduct includes: the unconstitutional use of force by LAPD officers, including improper officer-involved shootings; improper seizures of persons, including making police stops not based on reasonable suspicion and making arrests without probable cause; seizures of property not based on probable cause; and improper searches of persons and property with insufficient cause." Upon information and belief, this pattern or practice of police conduct expanded as far back as the 1980s and 1990s, including the time period applicable to Plaintiff Barry William's convictions.

275. In November 2003, the DOJ and the LAPD entered into a consent decree requiring extensive systemic reforms. Although intended to have a term of five years, the consent decree lasted until 2013.

276. At a minimum, findings of widespread corruption within the CRASH unit were not substantively reviewed for similar corruption and misconduct at the time of or subsequent to the multiple reports, federal complaint, and allegations. This review should have included any and all actions related to Plaintiff Barry Williams and his wrongful convictions, including the key role of LAPD CRASH detective Mejia and others.

277. Plaintiff Barry Williams is informed and believes and thereon alleges that, during all or portions of the period relevant to this case, Defendant CITY, by and through the LAPD, acted with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of criminal suspects and defendants, including Plaintiff Barry Williams. The City had a) no established or clear administrative system in place, b) no stated, written or adequate policies, c) no or inadequate training and supervisions; and/or d) ignored written policies and procedures regarding, inter alia, the following issues:

   a. Ensuring that the LAPD provided all exculpatory evidence gathered during an investigation of a case presented to the District Attorney's Office for prosecution, as numerous cases over the years made clear was its obligation;

   b. Ensuring that LAPD provided its full investigative material and that material is actually reviewed by an appropriate Deputy DA;

c. Ensuring that exculpatory evidence was not buried in files provided to the trial attorney handling the case by the police department or police officers with which the District Attorney's Office was working, and/or by members of its Office;

d. Ensuring that the LAPD provided to the trial attorney prosecuting that case full and complete reports of any benefits (including but not limited to benefits in the form of monetary or other pecuniary benefits and leniency in other charges) provided to any witness, and/or that such information was disclosed to the defense;

e. Ensuring that any benefits or monies paid to or for the benefit of witnesses was both known to the relevant people in the District Attorney's Office, including the attorney assigned to try the case, and/or disclosed to the defense;

f. Ensuring that false evidence was not being presented or relied upon by Deputy District Attorneys in prosecuting cases;

g. Ensuring that the key police reports and other key case documents provided full and complete descriptions of witness interactions and called attention to any irregularities, deviations from policy or evidence favorable to the defense;

h.  Ensuring that exculpatory evidence learned or discovered after trial and conviction (including between trial and sentencing and after sentencing) was disclosed to defendants and their counsel;

i.  Establishing procedures or systems to track or identify known false witness statements or other known facts that would make them unsuitable as witnesses in other cases or would be exculpatory evidence undermining their credibility if they were used as witnesses;

j.  Failing to discipline personnel involved in dishonesty, particularly in enabling, encouraging, condoning or presenting false testimony that was known or should have been known to be false or that was utilized with a reckless disregard for, or deliberate indifference towards, the truth and the rights of the accused;

k.  Establishing procedures so all exculpatory/impeachment evidence discovered by LAPD after the preliminary hearing stage is provided to the defense; and/or

l.  Establishing procedures so all exculpatory/impeachment evidence discovered by LAPD after a conviction is provided to the defense.

278. The customs, policies, practices, failures, actions and inactions of the CITY, by and through the LAPD, elaborated herein were or should have been known to the policy makers responsible for the CITY and occurred with deliberate

indifference to either the recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to adopt and implement systems, policies, training, supervision or discipline in areas where the need for such things to occur was obvious. Given the long and recurring history elaborated above, the CITY and its policy makers were on notice of these deficiencies and failures.

279. The customs, policies, practices, failures, actions and inactions of the CITY elaborated above were so closely related to the deprivation of Plaintiff Barry Williams' rights as to be a moving force that caused the constitutional violations alleged herein.

280. As a direct and proximate result of Defendant CITY'S acts and omissions, condoning, encouraging, ratifying and deliberately ignoring the pattern and practice of district attorney's acts and omissions alleged above, Plaintiff Barry Williams sustained injury and damage to be proved at trial.

281. Plaintiff Barry Williams specifically alleges that Defendants' complained of acts and/or omissions, were within each of their control, and within the feasibility of each of them, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiff Barry Williams.

# SIXTH CLAIM FOR RELIEF
## 815.2 FOR RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY INCLUDING FOR NEGLIGENT SUPERVISION AND TRAINING
### (Plaintiff Barry Williams Against Defendants County and City)

282.  Plaintiff Barry Williams realleges all foregoing paragraphs and any subsequent paragraphs contained in this complaint, as if fully set forth herein.

283.  California state law provides that public entities are directed to pay any tort judgment for any claim or action against an employee of the public entity for an injury arising out of an act or omission occurring within the scope of his or her employment.

284. Defendants are or were employees of Los Angeles COUNTY and/or CITY and acted within the scope of their employment in committing the acts and omissions described herein.

285. Supervisory Defendants named herein, and other supervisory personnel whose identities are not currently known, had a duty to ensure that law enforcement and prosecutorial personnel under their supervision conducted criminal investigations and prosecutions in a manner that complied with constitutional protections for those facing criminal charges, including the right to a fair trial and to the proper preservation, tracking and location of evidence, including actual or potential exculpatory evidence. Supervisory Defendants supervisory personnel whose identities are not currently known failed to properly

supervise and train employees in (a) ensuring that exculpatory evidence is provided and disclosed to those facing criminal charges, (b) in ensuring that false evidence is not used in any investigation or prosecution, and (c)  otherwise complying with their responsibilities related to their ongoing legal, constitutional, and statutory duties that obligated them to preserve, not destroy, and turn over evidence to Plaintiff Barry Williams.

286. Defendant COUNTY and/or CITY is legally obligated to pay any judgment entered against individually named Defendants.

287. Plaintiff Barry Williams specifically alleges that Defendants' complained of acts and/or omissions, were within each of their control, and within the feasibility of each of them, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiff Barry Williams.

## SEVENTH CLAIM FOR RELIEF
## CLAIM UNDER CALIFORNIA CODE § 52.1
### (Plaintiff Barry Williams against All Defendants)

288.  Plaintiff Barry Williams realleges all foregoing paragraphs and any subsequent paragraphs contained in this complaint, as if fully set forth herein.

289.  Defendants interfered or attempted to interfere with Plaintiff Barry Williams' rights secured by the United States and California Constitutions and laws, including through the use of threats, intimidation, and/or coercion.

290. As a direct and proximate cause of the aforementioned acts, Plaintiff Barry Williams was damaged by being confined to death row and exposed to other unduly prolonged prison conditions that resulted in avoidable physical, mental, and pecuniary injuries, for which the Defendants are each jointly and severally liable.

291.  As a direct and proximate cause of the aforementioned acts, Plaintiff Barry Williams was damaged in an amount to be proven at trial but in any event not less than the statutory monetary amount set forth per violation, pursuant to the provisions of California Civil Code §52, inter alia.

292. Plaintiff Barry Williams specifically alleges that Defendants' complained of acts and/or omissions, were within each of their control, and within the feasibility of each of them, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiff Barry Williams.

## EIGHTH CLAIM FOR RELIEF
## NEGLIGENCE
### (All Plaintiffs Against All Defendants)

293.  Plaintiffs Barry Williams and Damien Williams reallege all foregoing paragraphs and any subsequent paragraphs contained in this complaint, as if fully set forth herein.

294. This cause of action arises under the general laws and Constitution of the State of California.

295. For purposes of this claim for relief, allegations are deemed to sound in negligence, and set forth pursuant to Cal Civ Code § 1714.

296. In performing all of the complained of acts and omissions throughout this Complaint by way of their conduct, Defendants, and each of them, have breached the duty to act reasonably under the circumstances described.

297. As a direct and proximate result of the foreseeable conduct throughout this Complaint, Plaintiffs have suffered and continue to suffer great emotional pain and injury, all in an amount to be determined according to proof at trial.

298. Plaintiffs specifically allege that Defendants' complained of acts and/or omissions, were within each of their control, and within the feasibility of each of them, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiffs.

## NINTH CLAIM FOR RELIEF
## VIOLATION OF MANDATORY DUTIES
### (All Plaintiffs Against All Defendants)

299.  Plaintiffs Barry Williams and Damien Williams reallege all foregoing paragraphs and any subsequent paragraphs contained in this complaint, as if fully set forth herein.

300. The Fourteenth Amendment to the United States Constitution and California Civil Code § 52.1 are enactments. Enactments form the basis of a mandatory duty under California Government Code §815.6.

301. These federal and state statutes apply to all members of the general public, including Plaintiffs, and were all designed to prevent the kind of injuries alleged herein.

302. Defendants did not exercise reasonable diligence in discharging their duty to refrain from violating the constitutional rights of Plaintiffs.

303. As a direct and proximate cause of the aforementioned acts of defendants, Plaintiffs were damaged in amounts to be determined at trial.

304. Plaintiffs specifically allege that Defendants' complained of acts and/or omissions, were within each of their control, and within the feasibility of each of them, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiffs.

## XII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Barry Williams, requests relief on his own behalf as follows, and according to proof, against each Defendant:

1.     General and compensatory damages in an amount according to proof;

2.     Special damages in an amount according to proof;

3.     Presumed damages in an amount determined by the jury;

4.     Exemplary and punitive damages against each applicable Defendant in an amount according to proof;

5.     In addition to actual damages, statutory damages as allowed by law and treble damages under California Civil Code §§52 and 52.1;

6.     Attorneys' fees and costs under 42 U.S.C. §1988; California Civil Code §§52(b)(3), 52.1 (h); California Code of Civil Procedure §1021.5, and whatever other Statue or law may be applicable; and

7.     The costs of this suit and such other relief as is just and proper.

### JURY DEMAND

Plaintiffs hereby demand trial by jury in this action.


Respectfully submitted,

DATE: May 15, 2024                    */s/ Je Yon Jung*
                                      JE YON JUNG (SBN #329774)

**MAY JUNG, LLP**
333 City Blvd. West
Suite 327
Orange, CA 9286
(818) 869-6476
jeyon@mayjung.com
*Attorney for Plaintiffs*

# JURY DEMAND

Plaintiffs hereby demand trial by jury in this action.

Respectfully submitted,

DATE: May 15, 2024

*/s/ Je Yon Jung*

JE YON JUNG (SBN #329774)
**MAY JUNG, LLP**
333 City Blvd. West
Suite 327
Orange, CA 9286
(818) 869-6476
jeyon@mayjung.com

OLU K. ORANGE (SBN #213653)
**ORANGE LAW OFFICES, P.C.**
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
(213) 736-9900
Email: oluorange@att.net

*Attorneys for Plaintiffs*